1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   GTE MOBILNET OF CALIFORNIA              Case No.  20-cv-05460-DMR
    LIMITED PARTNERSHIP,
8
                Plaintiff,
9                                           ORDER ON CROSS MOTIONS FOR
        v.                                  SUMMARY JUDGMENT
10
                                            Re: Dkt. No. 90
    CITY OF BERKELEY, et al.,
11
                Defendants.
12

13          Plaintiff GTE Mobilnet of California ("Verizon") filed this action for declaratory judgment

14   under the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332(c)(7) against Defendant

15   City of Berkeley ("Berkeley" or "the City"), alleging that Berkeley unlawfully denied Verizon's

16   application to construct a personal wireless service facility in Berkeley, California.  Verizon now

17   moves for summary judgment on its three claims for relief.  [Docket No. 83.]  Berkeley opposes

18   the motion.  [Docket No. 85.]  Intervenor-Defendants Berryman Reservoir Neighbors ("BRN")

19   cross move for summary judgment.  [Docket No. 90.]  For the following reasons, Verizon's

20   motion is granted in part and denied in part.  BRN's motion is granted in part and denied in part.

21   I.     BACKGROUND[1]

22          A.      Factual Background

23                  1.      Verizon's Application

24          On December 17, 2018, Verizon submitted a zoning project application ("the

25   _____

26   [1] Verizon asks the court to take judicial notice of a page from Berkeley's website that describes
     the application of its former "Legacy Zoning Ordinance" to projects deemed complete or approved
27   before November 30, 2021, and five portions of the Legacy Zoning Ordinance that were in effect
     during Berkeley's review of the Application.  [Docket No. 84 (Pl.'s RJN).]  Berkeley asks the
28   court to take judicial notice of a portion of its municipal code and a page from its website that
     provides information about online video of public meetings.  [Docket No. 86 (Def.'s RJN).]  No

United States District Court
Northern District of California

1    Application") to Berkeley's Planning and Development Department, Land Use Planning Division

2    to build a wireless telecommunications facility at the East Bay Municipal Utility District

3    ("EBMUD") Berryman Reservoir, located in Berkeley, California.  [Docket Nos. 60-62, 80

4    (Administrative Record, "A.R.") 1-55.]  The Application proposed installation of a 50-foot

5    monopole disguised as an evergreen tree (a "monopine") along with six antennas, six remote radio

6    units, and related cables and equipment mounted on the monopole.  Supporting equipment,

7    including a diesel generator with a 132-gallon tank, would be installed on the ground.  *See* A.R. 1,

8    6.  Verizon wrote in the Application that its "objective is to improve coverage in the Berkeley

9    Hills area . . . and to offload traffic from other nearby sites that are often at or exceeding capacity."

10   A.R. 5.  It further wrote that it proposed "to provide LTE service from this facility," and explained

11   LTE as follows:

12               LTE is a "data only" service, for which the term "minutes of use" has
                 no meaning.  The throughput or capacity of an LTE site is not
13               measured in terms of the number of telephone calls, or the number of
                 minutes of telephone usage, or blocked or dropped telephone calls.
14               While voice telephone service will ultimately be provided from the
                 proposed site, that service is just any other service that uses data, like
15               e-mail or web browsing, or video.

16   A.R. 6.

17          Berryman Reservoir is located in a single-family residential district with a hillside overlay,

18   referred to as zoning district R-1H.  A.R. 126, 129.  Pursuant to the Berkeley Municipal Code

19   ("BMC"), structures in R-1H zones are limited to a maximum height of 35 feet absent an

20   administrative use permit.  BMC § 23E.96.070.B.  Accordingly, Verizon applied for a use permit

21   to build the wireless facility as well as an administrative use permit to accommodate the proposed

22   facility's height.  *See* A.R. 126; *see* BMC § 23D.04.020.B (specifying that an administrative use

23   _____

24   party objected to these requests for judicial notice.  Judicial may be taken of "a fact that is not
     subject to reasonable dispute" if it "can be accurately and readily determined from sources whose
25   accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  Judicial notice of the
     portions of Berkeley's Legacy Zoning Ordinance and municipal code are proper subjects for
26   judicial notice and the requests are granted as to them.  *See Santa Monica Food Not Bombs v. City
     of Santa Monica*, 450 F.3d 1022, 1025 n.2 9th Cir. 2006) (city ordinances are proper subjects for
27   judicial notice).  The information on the webpages is also judicially noticeable as information on a
     governmental body's website.  *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033-
28   34 (C.D. Cal. 2015) (taking judicial notice of information from website run by governmental
     agency).

permit must be secured for wireless telecommunication antennas built higher than the district's height limit).[2]

On January 16, 2019, Berkeley's planning staff requested additional information, including photo-simulations of alternative designs, which Verizon provided. A.R. 71-72, 73-83. In May 2019, third party Rincon Consultants, Inc. ("Rincon") submitted a peer review of the Application to Berkeley that confirmed that the wireless facility would comply with FCC limits on radio frequency ("RF") emissions. Pl.'s Mot. Ex. A (legible version of A.R. 90-103).[3] Rincon also asked for clarification regarding noise levels. A.R. 90. In June 2019, Verizon provided a report from another third party, Hammett & Edison, Inc., (A.R. 106-121), that confirmed that the facility would "comply with the City's noise limits." A.R. 108.

The Application was scheduled for a June 27, 2019 public hearing before Berkeley's Zoning Adjustments Board ("ZAB"). A.R. 122. Prior to the hearing, Berkeley's planning staff released a report to the ZAB analyzing the Application's compliance with the BMC and other applicable law (the "ZAB Staff Report"). A.R. 888-906. The ZAB Staff Report concluded that the Application was "in compliance with the requirements established in [BMC] Chapter 23C.17 for the approval of Use Permits for new wireless communication facilities," including necessity, RF exposure, noise, and height requirements. A.R. 892-94.

The ZAB Staff Report also discussed the "design and aesthetic qualities" of the Application and certain related BMC requirements. A.R. 894-95. BMC section 23C.17.070, entitled "Design Requirement," states that "[i]n addition to all other requirements set forth in this chapter, all wireless telecommunications facilities shall meet" 15 separately-enumerated design

---

[2] Pursuant to the BMC, an administrative use permit may be issued "only upon finding that the establishment, maintenance or operation of the use, or the construction of a . . . structure . . . will not be detrimental to the health, safety, peace, morals, comfort or general welfare of persons residing or working in the area or neighborhood of such proposed use or be detrimental or injurious to property and improvements of the adjacent properties, the surrounding area or neighborhood or to the general welfare of the City." BMC section 23B.28.050.A.

[3] Verizon improperly submitted Rincon's report as an exhibit without authenticating it in accordance with Civil Local Rule 7-5. Verizon subsequently authenticated the exhibit in accordance with the court's April 14, 2022 Order. [*See* Docket Nos. 89, 91 (Mosley Decl., Apr. 15, 2022) ¶ 2.]

United States District Court
Northern District of California

requirements.  In relevant part, these requirements include:

> B. All facilities shall be designed and located to minimize their visibility to the greatest extent feasible, considering technological requirements, by means of placement, screening, and camouflage . . .
>
> C. No readily visible antenna shall be placed at a location where it would impair a significant or sensitive view corridor[4] except as provided in subsection 1, below.
> . . .
>
>> [1.] [G]round mounted antennas shall not be placed in direct line of sight of significant or sensitive view corridors or where they adversely affect scenic vistas unless the Zoning Officer or [ZAB] finds that the facility incorporates appropriate, creative stealth techniques to camouflage, disguise, and/or blend into the surrounding environment to the extent possible.
>> . . .
>>
>> 3. All monopoles and lattice towers shall be designed to be the minimum functional height and width required to support the proposed antenna installation unless a higher monopole or lattice tower will facilitate co-location or other objectives of this Chapter.

BMC § 23C.17.070(B)-(C).  In turn, BMC defines "readily visible" as follows:

> A wireless telecommunications facility is readily visible if it can be seen from street level or from the main living area of a legal residence in a residential district or from a public park by a person with normal vision, and distinguished as an antenna or other component of a wireless telecommunication facility, due to the fact that it stands out as a prominent feature of the landscape, protrudes above or out from the building or structure ridgeline, or is otherwise not sufficiently camouflaged or designed to be compatible with the appurtenant architecture or building materials.  For purposes of this definition, "main living area" means the living and dining and similar areas of a dwelling, but not bedrooms, bathrooms or similar areas.

BMC § 23F.04.010.

Additionally, BMC section 23C.17.100.B.2 states that in order to issue a use permit for a wireless telecommunications facility, the ZAB or Zoning Officer must find that the proposed facility complies with all applicable state and federal standards and either "a. will not be readily visible; or b. will be readily visible, but it is not feasible to incorporate additional measures that

---

[4] "View corridor" is defined as "[a] significant view of the Berkeley Hills, San Francisco Bay, Mt. Tamalpais . . . or any other significant vista that substantially enhances the value and enjoyment of real property."  BMC § 23F.04.010.

1   would make the facility not readily visible," among other required findings.

2         While Berkeley's planning staff found that the original proposal of a monopine design

3   "would comply with" BMC section 23C.17.100.B.2's requirement that the facility "not be readily

4   visible," it discussed public comments that "the proposed faux tree [was] not a desirable design."

5   The ZAB Staff Report ultimately recommended that the ZAB approve the Application with a

6   "Condition of Approval that the wireless facility be designed as an un-camouflaged monopole

7   painted green" rather than the proposed monopine design.  A.R. 894-96.  The ZAB Staff Report

8   did not expressly address the requirements of BMC section 23C.17.070(B)-(C).  *See id.*

9                     **1.  ZAB's Denial of the Application**

10        The ZAB held a public hearing on the Application on June 27, 2019.  A.R. 2765-2908

11  (transcript of hearing).  The ZAB heard presentations from the planning staff, which

12  recommended approval of the Application subject to the condition that the facility be designed as

13  an uncamouflaged, green monopole.  A.R. 2766-72.  Verizon representatives answered questions

14  from ZAB commissioners.  A.R. 2774-2800, 2852-60.  One ZAB commissioner asked about the

15  50-foot height of the proposed facility and its necessity: "[w]e're not told whether or not a 35 foot

16  pole would do an adequate job.  Do we have to approve a 50-foot pole?"  A.R. 2787.  A Verizon

17  representative explained that the pole needed to "clear the water tank . . . which is made of metal

18  and would interfere with the signal," but that Verizon "may be able to lower the tower somewhat."

19  A.R. 2787.  Members of the public who opposed the Application spoke about RF emissions, the

20  aesthetics and location of the proposed facility, interference with neighborhood views, and noise,

21  among other concerns.  A.R. 2802-52.  The ZAB then deliberated and unanimously approved a

22  motion to deny the Application.  A.R. 2860-79.

23        On July 2, 2019, the ZAB mailed Verizon a Notice of Decision with "Findings of Denial."

24  A.R. 1487-93.  The ZAB's Findings of Denial stated in relevant part that the Application "did not

25  provide adequate evidence" that the proposed facility "is required to support the need to prevent a

26  gap in coverage or capacity shortfall."  It also stated that the proposed facility "does not meet the

27  provisions of the 2002 General Plan" because it "a. [i]s not consistent with the scale or historic

28  character of the surrounding uses; b. [d]oes not foster an aesthetically pleasing urban environment;

United States District Court
Northern District of California

1    c. [d]oes not prevent visual blight, protect and preserve public safety and general welfare; and d.

2    [d]oes not maintain the character of residential areas . . ." A.R. 1492-93.  The Findings of Denial

3    also stated that it was not possible to determine whether a monopole or monopine would be

4    "readily visible" and that Verizon had not demonstrated that the proposed facility would satisfy

5    BMC height and design requirements.  A.R. 1493.

6                    **2.       Berkeley City Council's Denial of Verizon's Appeal**

7           On July 16, 2019, Verizon appealed the ZAB's denial to the Berkeley City Council,

8    challenging the denial on five separate grounds.  A.R. 1494-96.  It later submitted a report by its

9    Radio Frequency Design Engineer (the "RF Statement") and an "Alternatives Analysis" in support

10   of its appeal.  The March 5, 2020 RF Statement described the purported coverage gap and

11   included drive test data and coverage maps.  A.R. 1582-91.  According to the RF Statement,

12   "exponential growth in demand has led to capacity exhaustion of the Verizon Wireless facility that

13   provides the most service to the gap area."  A.R. 1582.  One map in the report purportedly showed

14   "a lack of in-building coverage in the north Berkeley hills and barely any in-vehicle coverage."

15   A.R. 1584.  The RF Statement also concluded that "[m]odifying the surrounding facilities is not a

16   feasible solution" because other "facilities serving the gap area are fully built out to provide all

17   channels on all four frequency bands used by Verizon Wireless . . ."  A.R. 1585.

18          Verizon's Alternatives Analysis, also dated March 5, 2020, evaluated a microcell network

19   and alternative sites for the proposed facility.  A.R. 1694-1717.  The Alternatives Analysis

20   concluded that 12 microcell facilities would be required to serve the gap area, and that for various

21   reasons, including visibility and proximity to streets and residences, a microcell network was "a

22   less feasible and potentially more intrusive alternative to the Proposed Facility."  A.R. 1699.  The

23   Alternatives Analysis then considered three possible façade- and roof-mounted facilities and seven

24   freestanding tower facilities, including the proposed facility, and concluded that the Application

25   "constitutes the least intrusive feasible alternative to provide service to the identified gap in

26   network service based on the values expressed in the [BMC]."  A.R. 1701-1716, 1696.

27          The Berkeley City Council scheduled a hearing on the appeal for July 7, 2020.  Prior to the

28   hearing, Berkeley retained an independent consultant, Telecom Law Firm ("TLF"), to review

United States District Court
Northern District of California

6

1    Verizon's RF statement and Alternatives Analysis.  A.R. 1718-48.  In its May 7, 2020 report (the

2    "TLF report"), TLF addressed each of the alternative sites set forth in the Alternatives Analysis

3    and compared them with the proposed facility.  A.R. 1722-42.  It concluded that "none of the

4    alternative sites identified by Verizon offer any realistic possibility to be a viable alternative to the

5    proposed Berryman Reservoir site."  A.R. 1742.  TLF also analyzed photos of the Berryman

6    Reservoir site and neighboring Codornices Park to assess whether the proposed facility would be

7    "readily visible" from the park and concluded that it would not be "readily visible" within the

8    meaning of the BMC.  A.R. 1731-34.  TLF did not address the microcell network alternative.

9         TLF also reviewed Verizon's RF statement, including the drive test data and coverage

10   maps, and concluded that "there are areas within the claimed gap that have adequate Verizon

11   signal strength to provide personal wireless services, but other areas do not," and that failure to

12   add another cell site to serve the "claimed gap area" could lead to "lower data throughput speeds

13   and potentially some undisclosed degradation(s) on the ability of Verizon customers . . . to make

14   and receive calls in the claimed gap area."  A.R. 1748.  TLF ultimately concluded that "(a) there

15   are underserved areas within the claimed gap area that are likely to be subject to reducing service

16   levels if a new nearby cell site is not constructed, and (b) among the alternative sites identified by

17   Verizon, the Berryman Reservoir site is most able to serve the claimed gap area with the least

18   visual impact on the community."  A.R. 1718.

19        Berkeley's Planning Director submitted a report to the City Council regarding Verizon's

20   appeal in advance of the hearing (the "Council staff report").  A.R. 1617-28.  The Council staff

21   report went through each of the five grounds for appeal and provided responses.  In relevant part,

22   the report summarized BMC requirements regarding visual impact but did not reach a firm

23   conclusion on the proposed facility's compliance with the requirements:

24            It is possible that neighbors and park users could see the pole, but it
              is not clear that it would be obtrusive in light of the existing tree cover
25            around the perimeter of the reservoir and the distances to the viewers,
              and it does not appear that the pole would be in a line of sight to a
26            significant view corridor because it would be located to the far north
              of the site while residential views are generally toward the west.
27

28   A.R. 1627.

United States District Court
Northern District of California

1   The Council staff report also addressed the height of the proposed facility.  It noted that the

2   BMC states that "[a]ll monopoles . . . shall be designed to be the minimum functional height and

3   width required to support the proposed antenna installation unless a higher monopole . . . will

4   facilitate co-location or other objectives."  A.R. 1627 (quoting BMC § 23C.17.070.C.3).  The

5   Council staff report noted that a ZAB commissioner had asked the Verizon representative about

6   the height of the proposed facility at the ZAB hearing and that the representative "stated that they

7   may be able to lower the height, perhaps to a maximum height of 40 or 45 feet, but did not specify

8   to what degree."  It concluded, "[t]he additional information provided by the applicant does not

9   discuss whether lowering the height of the proposed facility would materially inhibit the

10   introduction of new services or the improvement of existing services."  A.R. 1627.

11       On July 1, 2020, Verizon submitted a letter to the City Council in support of its appeal

12   with additional materials.  A.R. 1558-81.  This included a new alternative design for the facility, a

13   45-foot water tank design, with photosimulations.  A.R. 1568.  Verizon also submitted a

14   "Statement of Minimum Functional Height" from its Radio Frequency Design Engineer.  A.R.

15   1579-81.  The engineer stated, "Verizon Wireless's proposed 50-foot monopine facility . . .

16   requires an antenna centerline of 40.75 feet to serve the significant gap," and that "[a]n antenna

17   centerline of lesser height would result in reduced coverage, with fewer customers served."  A.R.

18   1579.

19       The City Council heard the appeal on July 7, 2020.  A.R. 2617-67 (relevant portion of

20   unofficial transcript of hearing).  It heard presentations from Berkeley's planning staff, A.R. 2620-

21   23, and an attorney representing Verizon, A.R. 2623-26.  Members of the public opposed to the

22   Application commented.  A.R. 2626-29, 2634-47.  A member of the EBMUD Board also spoke

23   about the design process for the EBMUD facility at the site and opined that an "artificial tree

24   seems inconsistent" with the site.  A.R. 2630-34.  City Council members expressed concerns about

25   the aesthetics and visibility of the proposed facility and impact on views and its potential

26   placement on a fault line.  A.R. 2647-49, 2657-64.  The City Council then voted to adopt a

27   resolution affirming the denial of the Application based on findings stated on the record.  A.R.

28   2665-67.

### 3.  Berkeley's Written Denial

On July 9, 2020, Berkeley posted on its website an annotated agenda of the July 7, 2020 meeting reflecting that the City Council had adopted Resolution No. 69,487 affirming the ZAB's decision to deny the Application (the "Denial Resolution").  A.R. 3575-81 (Annotated Agenda).[5]

Berkeley mailed written notice of its denial of the Application along with a copy of the denial resolution to Verizon on September 8, 2020.  A.R. 2746-48, 2707-10.  The denial resolution, which states that it was adopted on July 7, 2020, lists seven "Findings of Denial":

1) Verizon did not demonstrate that the proposed facility "will not be readily visible, or that it is not feasible to incorporate additional measures that would make the facility not readily visible";

2) Verizon did not "present substantial evidence that the project facility is designed and locate to minimize [its] visibility to the greatest extent feasible";

3) Verizon did not demonstrate that the proposed facility complied with BMC section 23C.17.070.C, which requires that "no readily visible antenna shall be placed at a location where it will impair a significant or sensitive view corridor" or BMC section 23C.17.070.C.3 that "the proposed monopole was designed to be the minimum functional height and width required to support the proposed antenna installation";

4) the proposed facility exceeds the 35 foot height limit for the district in which it would be located;

5) Berkeley could not make the findings for approval of an administrative use permit to exceed the height limit "because the project would be detrimental to the health, safety, peace, morals, comfort or general welfare of persons residing or working in the area or neighborhood . . . or be detrimental or injurious to property and improvements of the adjacent properties, the surrounding area or neighborhood or to the general welfare of the City," due to visibility and location on an earthquake fault;

---

[5] Although Berkeley does not cite evidence in the administrative record regarding the date of posting, *see* Berkeley's Mot. 13, the fact that it posted the annotated agenda on July 9, 2020 does not appear to be in dispute, as the parties included this fact in their October 2020 joint case management statement.  [*See* Docket No. 24 at 4.]

United States District Court
Northern District of California

6)   Verizon "failed [to] meet its burden of showing that denial of the proposed project would effectively prohibit the provision of wireless service," and "there are reasonable, potentially available and technologically feasible alternatives to the proposed project"; and

7)   "the record has ample evidence to support each one of these elements of this denial." A.R. 2707-10.

## B.   Procedural History

Verizon filed its original complaint on August 6, 2020, alleging that Berkeley's denial of the Application was unlawful because it was not in writing in violation of 47 U.S.C. § 332(c)(7)(B)(iii) and asserting that Berkeley "has never issued a written denial, nor provided any statement explaining its reasons for denying the Application" (claim one).  Compl. ¶¶ 49-51.  It further alleged that the denial was not based on substantial evidence in violation of 47 U.S.C. § 332(c)(7)(B)(iii) (claim two), and that the denial was unlawful because it had the effect of prohibiting Verizon from providing personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) (claim three).

In September 2020, Michael Burt, Angelina DeAntonis, Joann Driscoll, Allen Myers, Regina Myers, Christian L. Raisner, Oliver Raisner, Lucinda Reinold, Wendy Stock, and Paul Teicholz (collectively, "Berryman Reservoir Neighbors" or "BRN") moved for leave to intervene pursuant to Federal Rule of Civil Procedure 24(a) and 24(b).  These individuals live near the proposed facility.  Each participated in Berkeley's review of the Application before the ZAB and the City Council and each claims that the presence of the proposed facility would adversely impact their interests.  Verizon opposed the motion to intervene.  On October 19, 2020, the court granted the motion to intervene and ordered BRN to file an answer by October 23, 2020.  [Docket No. 22.] Rather than filing an answer, BRN moved pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the complaint.

Verizon then moved for leave to amend and supplement the complaint to add allegations about actions that took place after it filed the original complaint; specifically, that Berkeley issued a written denial of the Application on September 8, 2020.  In the original complaint, the first claim

1   asserted that Berkeley had violated the TCA because its denial of the Application was not in

2   writing.  Berkeley sought leave to replace this with the claim that Berkeley failed to act on the

3   Application "within a reasonable period of time" after it was filed, in violation of 47 U.S.C. §

4   332(c)(7)(B)(ii), based on the allegation that the September 8, 2020 final action was untimely.

5   BRN opposed the motion for leave to amend and supplement the complaint.  In relevant part,

6   BRN argued that amendment was futile because the failure-to-act claim was barred by the statute

7   of limitations.  It also argued that the relation back doctrine could not be used to cure Verizon's

8   untimely amendment.  The court rejected this argument and granted Verizon's motion to amend

9   and supplement the complaint.  It denied the motion to dismiss the complaint as moot.  *GTE*

10  *Mobilnet of California Ltd. P'ship v. City of Berkeley I* ("*GTE I*"), No. 20-CV-05460-DMR, 2021

11  WL 308605, at *6, 8 (N.D. Cal. Jan. 29, 2021).

12      Verizon subsequently filed the first amended and supplemental complaint ("FASC").

13  [Docket No. 37.]  BRN moved pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss the FASC.  The

14  court denied the motion on September 28, 2021.  *GTE Mobilnet of California Ltd. P'ship v. City of*

15  *Berkeley* ("*GTE II*"), No. 20-CV-05460-DMR, 2021 WL 4442650, at *1 (N.D. Cal. Sept. 28,

16  2021).  BRN moved for leave to file a motion for reconsideration of portions of the order denying

17  the motion to dismiss, which the court denied.  *GTE Mobilnet of California Ltd. P'ship v. City of*

18  *Berkeley* ("*GTE III*"), No. 20-CV-05460-DMR, 2022 WL 562756, at *1 (N.D. Cal. Feb. 24,

19  2022).

20      The FASC, which is the operative complaint, states three claims for relief.  First, Verizon

21  alleges that Berkeley failed to act on the Application "within a reasonable period of time" after it

22  was filed, "in violation of 47 U.S.C. § 32(c)(7)(B)(ii), as interpreted by the Federal

23  Communications Commission ('FCC') in its 'Shot Clock Ruling,' *In re Petition for Declaratory*

24  *Ruling*, 24 FCC Rcd. 13994, 14005 (November 18, 2009) and implementing regulations."  FASC

25  ¶ 3; *see also* ¶¶ 52-62 (claim one or the "failure-to-act claim").  Verizon alleges that under the

26  Shot Clock Ruling, the deadline for Berkeley to take final action on the application was July 10,

27  2020, but that it did not act until September 8, 2020.  *Id.* at ¶¶ 53-61.

28      Second, Verizon alleges that Berkeley's written denial was not based on substantial

1   evidence in violation of 47 U.S.C. § 332(c)(7)(B)(iii) (claim two or the "substantial evidence

2   claim"). *Id.* at ¶¶ 64-66.

3          Third, Verizon alleges the denial was unlawful because it had the effect of prohibiting

4   Verizon from providing personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II)

5   (claim three or the "effective prohibition claim"). *Id.* at ¶¶ 68. Verizon seeks declaratory and

6   injunctive relief based on Berkeley's denial of the Application.

7          The parties agreed that these cross motions for summary judgment can be decided based on

8   the administrative record and matters properly subject to judicial notice. [*See* Docket No. 24 (Am.

9   Joint Rule 26(f) Report & Case Management Statement, "CMC statement") at 5.] Now before the

10  court are Verizon and BRN's cross motions for summary judgment on all three claims, and

11  Berkeley's opposition to Verizon's motion. [Docket Nos. 83 (Pl.'s Mot.), 85 (Berkeley's Opp'n),

12  90 (BRN's Mot.), 92 (Pl.'s Opp'n/Reply), 94 (BRN's Reply).] BRN joins Berkeley's opposition.

13  [Docket No. 95.]

14  **II.     BRN'S REQUEST FOR ADDITIONAL PAGES**

15         The parties originally stipulated to a briefing schedule on the cross motions for summary

16  judgment, which was extended several times for various reasons, including to supplement the

17  administrative record. [Docket Nos. 26, 29, 39, 51, 53, 57, 72.] After Berkeley clarified that it

18  would oppose Verizon's motion for summary judgment but would not oppose BRN's motion for

19  summary judgment (Docket No. 79), the court set a final briefing schedule and page limits.

20  [Docket No. 81.] In particular, (1) Verizon was granted 25 pages for its motion and 30 pages for

21  a single brief containing its opposition to BRN's motion and reply to BRN and Berkeley's

22  opposition briefs, for a total of 55 pages; (2) Berkeley was granted 25 pages to brief its opposition

23  to Verizon's motion for summary judgment; and (3) BRN was granted 30 pages for its combined

24  opposition to Verizon's motion and cross motion for summary judgment and 15 pages for a reply,

25  for a total of 45 pages. *Id.* Based on the court's experience with the parties' prior briefing on

26  substantive motions, including BRN's inappropriate attempt "to get around the page limits set

27  forth in Civil Local Rule 7-3," *see GTE I*, 2021 WL 308605, at *4 n.1, the court expressly ordered

28  that briefing on the cross motions for summary judgment could not "incorporate by reference any

12

United States District Court
Northern District of California

1   other submissions, including other parties' briefs," and discouraged footnotes as "rarely helpful or

2   persuasive" and "usually an attempt to get around page limits." [Docket No. 81.]  After Verizon

3   and BRN requested clarification about which materials count toward page limits, the court held

4   that the tables of content and authorities were not included in those limits.  [Docket No. 89.]

5   Neither side requested additional pages at that time.  [*See* Docket Nos. 82, 88.]

6        BRN now asserts in its combined opposition to Verizon's motion and cross motion for

7   summary judgment that its brief "cannot provide a full summary of the 4506 page Administrative

8   Record, and at the same time fully develop all of the law relevant to this motion and opposition."

9   BRN's Opp'n 2.  It asks that it be permitted to submit "a supplemental pleading restricted to 20

10  additional pages."  *Id.*  Verizon opposes the request.  Pl.'s Opp'n 2.

11       BRN's request is denied.  The court set page limits so that the parties' arguments would be

12  focused and concise.  There is no indication in BRN's briefing that it was unable to develop its

13  arguments or otherwise brief the issues in dispute.  Additionally, BRN did actually not use all of

14  the pages allotted to it by the court's order.  Civil Local Rule 3-4(c) sets forth "general

15  requirements" for "papers presented for filing" and provides that text "must be double-spaced with

16  no more than 28 lines per page, except for the identification of counsel, title of the case, footnotes

17  and quotations."  Civ. L.R. 3-4(c)(2).  Despite the court's previous instruction to BRN's counsel to

18  "familiarize themselves with the Local Rules regarding motion practice," *GTE II*, 2021 WL

19  4442650, at *3 n.1, BRN's briefs contain only 22 lines of text per page, which amounts to 6 pages

20  it could have used in its opening brief alone if it had followed the rules.

21  **III.    BEEGLE'S DECLARATION**

22       As noted, at the outset of this case, the parties agreed that these cross motions for summary

23  judgment would be decided based on the administrative record and matters properly subject to

24  judicial notice.  Specifically, in the October 28, 2020 CMC statement, the parties wrote:

26              Verizon Wireless anticipates filing a motion for summary judgment,
                and the City and BRN may file cross-motions for summary judgment
27              (collectively, the "MSJ").  The parties agree that the MSJ will be
                limited to the administrative record for the Application ("the AR")
28              and matters properly subject to judicial notice.

United States District Court
Northern District of California

1    CMC statement at 5.  The parties also agreed to postpone their Rule 26 initial disclosures and "to

2    defer any discovery" until "after the Court decides the MSJ."  They proposed making initial

3    disclosures and submitting a discovery plan after any ruling on the MSJ if it did not "fully resolve

4    the case."  *Id*. at 6-7.

5         Additionally, the parties stated their agreement that "no discovery is necessary or

6    appropriate" with respect to claims one and two "as those claims are limited to the AR."  BRN

7    also stated its position "that this same rule should apply" to claim three, the effective prohibition

8    claim.  *Id*.  However, the parties "agree[d] that any discovery on the prohibition claim will be

9    limited to exchange of expert witness reports . . . and depositions of expert witnesses."  *Id*. at 7.

10        Notwithstanding these express agreements, BRN submitted evidence outside the

11   administrative record with its opening brief; specifically, a 56-page declaration by Robert L.

12   Beegle III.  [Docket No. 90-1.]  BRN describes Beegle as "an expert in the fields of forensic

13   Cellular Phones, Cell Tower Coverage, RF Propagation Mapping, and Still Image Analysis" and

14   argues his declaration is relevant to the effective prohibition claim.  BRN's Mot. 4.  BRN devotes

15   nearly four pages of its opening brief to arguments in support of the court's consideration of

16   Beegle's declaration, including citing cases within the Ninth Circuit in which courts have

17   observed that courts may consider evidence beyond the administrative record in assessing

18   effective prohibition claims under 47 U.S.C. § 332(c)(7)(B)(i)(II).  *See id*. at 2-5 (citations

19   omitted).  It also argues that the court should consider the declaration because "the key technical

20   evidence that Verizon relies upon to support its [unlawful] prohibition claim did not surface until

21   late in the appellate stage of the administrative process" and was not disclosed to BRN

22   "sufficiently in advance of the City Council hearing" despite its repeated requests.  *Id*. at 4.

23        BRN's arguments are beside the point.  Whether the court may consider evidence outside

24   the administrative record is not at issue, because BRN agreed that the court could decide this

25   motion *based solely on the administrative record and judicially-noticeable facts*.  Verizon was

26   entitled to rely on the parties' agreement to defer discovery until after resolution of these motions.

27   It has not had any opportunity to test Beegle's statements or otherwise conduct discovery relevant

28   to his declaration.  Verizon's effective prohibition claim has been part of this case since the

1    original complaint.  To the extent BRN believed that the court should consider evidence beyond

2    the administrative record in considering the claim, it could have raised this issue long ago.  It does

3    not contend that it was unable to do so or otherwise explain why it waited until this late stage.

4    Accordingly, the court declines to consider Beegle's declaration in connection with these motions.

5    Verizon's objection to and motion to strike the declaration (Docket No. 93) is denied as moot.

6    ## IV.    LEGAL STANDARD

7          A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

8    fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

9    of establishing the absence of a genuine issue of material fact lies with the moving party.

10   *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477

11   U.S. 317, 323 (1986)).  The court must view the evidence in the light most favorable to the non-

12   moving party.  *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir.

13   2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  A genuine factual issue

14   exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could

15   return a verdict for the nonmoving party.  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200

16   F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248).  The

17   court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.

18   *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*,

19   477 U.S. at 255).

20          To defeat summary judgment once the moving party has met its burden, the nonmoving

21   party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as

22   otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of

23   material fact exists.  *Devereaux*, 263 F.3d at 1076.  More than a "scintilla of evidence" must exist

24   to support the non-moving party's claims.  *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477

25   U.S. at 252).  A showing that "there is some 'metaphysical doubt' as to the material facts as issue"

26   will not suffice.  *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting

27   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "Where the

28   record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

United States District Court
Northern District of California

15

is no genuine issue for trial." *Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at 587).

Where, as here, the parties have filed cross-motions for summary judgment, "each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation omitted). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## V.    DISCUSSION

### A.  Claim One: Failure-to-Act

#### 1.    The Parties' Arguments

Verizon's first claim is that Berkeley failed to act on the Application "within a reasonable period of time" after it was filed, "in violation of 47 U.S.C. § 32(c)(7)(B)(ii), as interpreted by the Federal Communications Commission ('FCC') in its 'Shot Clock Ruling,' *In re Petition for Declaratory Ruling*, 24 FCC Rcd. 13994, 14005 (November 18, 2009) and implementing regulations." FASC ¶ 3. Verizon contends that under the Shot Clock Ruling and a tolling agreement between Verizon and Berkeley, Berkeley's shot clock deadline to take final action on the application was July 10, 2020 but that it did not act until September 8, 2020, when it mailed notice of the Denial Resolution to Verizon. Pl.'s Mot. 14-15.

Berkeley agrees that the parties extended the shot clock deadline to July 10, 2020 but argues that Verizon is not entitled to summary judgment on this claim due to disputed facts as to whether the claim itself is barred by the statute of limitations. Berkeley also argues that it issued a written denial of the Application prior to July 10, 2020, when it posted the annotated agenda of the July 7, 2020 City Council meeting on its website. Berkeley's Opp'n 15-17.

BRN argues that the shot clock deadline was September 30, 2020, so there was no untimely denial by Berkeley. BRN's Mot. 11-12.

Berkeley and BRN also argue that even if Berkeley violated 47 U.S.C. § 32(c)(7)(B)(ii), Verizon has already received the relief to which it is entitled—receipt of the Denial Resolution— and it is not entitled to additional injunctive relief in the form of overturning Berkeley's denial of

1  the Application.  Berkeley's Opp'n 18-19; BRN's Mot. 15-16.

2       The court will first address the shot clock deadline and then turn to the parties' remaining

3  disputes.

4              **2.      Analysis**

5       The TCA provides that "[a] State or local government or instrumentality thereof shall act

6  on any request for authorization to place, construct, or modify personal wireless service facilities

7  within a reasonable period of time after the request is duly filed with" such a municipality.  47

8  U.S.C. § 332(c)(7)(B)(ii).  A "reasonable period of time" under this provision "is presumptively

9  (but rebuttably) 90 days to process a collocation application (that is, an application to place a new

10 antenna on an existing tower) and 150 days to process all other applications."  *City of Arlington,*

11 *Tex. v. F.C.C.*, 569 U.S. 290, 295 (2013) (citing *In the Matter of Petition for Declaratory Ruling*

12 *to Clarify Provisions of Section 332(c)(7)(b)* ("*Shot Clock Order*"), 24 F.C.C. Rcd. 13994, 14005

13 (2009)).  If a municipality denies the request, the denial "shall be in writing and supported by

14 substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).

15      The so-called shot clock period for action on an application "is the sum of . . . (1) [t]he

16 number of days of the presumptively reasonable period of time for the pertinent type of

17 application . . . ; plus (2) [t]he number of days of the tolling period, if any . . ."  47 C.F.R. §

18 1.6003(b); *see City of Portland v. United States*, 969 F.3d 1020, 1036 (9th Cir. 2020) (discussing

19 "rules for when local jurisdictions have to act on wireless permitting requests, the so-called 'shot

20 clock' rules").  A municipality that fails to act on an application "on or before the shot clock date

21 for the application . . . is presumed not to have acted within a reasonable period of time," 47

22 C.F.R. § 1.6003(a), and "[a]ny person adversely affected by any final action or failure to act by a

23 State or local government or any instrumentality thereof . . . may, within 30 days after such action

24 or failure to act, commence an action in any court of competent jurisdiction."  47 U.S.C. §

25 332(c)(7)(B)(v).

26      The regulations set forth various tolling periods for an application to construct wireless

27 service facilities.  In relevant part, if a municipality notifies an applicant in writing of "missing

28 documents or information" within 30 days after the application is filed, the tolling period is the

United States District Court
Northern District of California

17

number of days from the day after the date the municipality notifies the applicant until "[t]he date when the applicant submits all the documents and information identified by the [municipality] to render the application complete." 47 C.F.R. § 1.6003(d)(2).[6]  Additionally, applicants and municipalities may extend the "reasonable period of time" in which a municipality must act "by mutual consent"; "in such instances, the commencement of the 30-day period for filing suit will be tolled." *Shot Clock Order*, 24 F.C.C. Rcd. 13994, 14013 at ¶ 49; *see also* 47 C.F.R. § 1.6003(d) (setting forth tolling periods "[u]nless a written agreement between the applicant and the siting authority provides otherwise").

### a.     The Shot Clock Deadline

The parties do not dispute that the 150-day deadline applies to Verizon's Application.  *See* A.R. 132; Pl.'s Mot. 14; BRN's Mot. 11.  Verizon filed the Application on December 17, 2018. Berkeley notified Verizon that the Application was incomplete and requested additional information on January 16, 2019, thus tolling the shot clock under 47 C.F.R. § 1.6003(d)(2).  A.R.

---

[6] The full text of the relevant portion of 47 C.F.R. § 1.6003(d)(2) is as follows:

> (d) Tolling period. Unless a written agreement between the applicant and the siting authority provides otherwise, the tolling period for an application (if any) is as set forth in paragraphs (d)(1) through (3) of this section.
> . . .
>
> [2] the tolling period shall be the number of days from—
>
> > (i) The day after the date when the siting authority notifies the applicant in writing that the application is materially incomplete and clearly and specifically identifies the missing documents or information that the applicant must submit to render the application complete and the specific rule or regulation creating this obligation; until
> >
> > (ii) The date when the applicant submits all the documents and information identified by the siting authority to render the application complete;
> >
> > (iii) But only if the notice pursuant to paragraph (d)(2)(i) of this section is effectuated on or before the 30th day after the date when the application was submitted;

47 C.F.R. § 1.6003(d)(2)(i)-(iii).

United States District Court
Northern District of California

71-72.  Verizon submitted additional materials in support of the Application on March 12, 2019.[7]
A.R. 73-86.  Verizon and Berkeley agree that the original shot clock deadline was 150 days later,
or July 10, 2019.  *See* Pl.'s Mot. 14; Berkeley's Opp'n 14, 15; A.R. 132.[8]

On July 23, 2019, Verizon and Berkeley entered into a tolling agreement in which they
extended the shot clock deadline to November 22, 2019.  A.R. 2911-12.  The agreement included
the following provision about the time periods for both parties to act:

> In order to allow the City to act on the Application without either party
> risking the loss of important rights, the parties agree that the time
> period within which the City may act on the Application shall be
> extended through the Extension Date, and that no limitations period
> for any claim of unreasonable or unlawful delay in processing the
> Application shall commence to run before said date.

A.R. 2912.  Verizon and Berkeley later executed four amendments thereto, with the final
amendment extending the shot clock to July 10, 2020.  A.R. 2922-23 (amendment to tolling
agreement extending shot clock to March 31, 2020); 2931-32 (amendment to tolling agreement
extending shot clock to April 30, 2020); 2939-40 (amendment to tolling agreement extending shot
clock to June 30, 2020); 2951-52 (amendment to tolling agreement extending shot clock to July
10, 2020).

Verizon and Berkeley agree that the final shot clock deadline was July 10, 2020.  *See* Pl.'s
Mot. 14-15; Berkeley's Opp'n 15.  BRN disputes this; it argues that the shot clock deadline was
September 30, 2020.  BRN contends that the court should not use the March 12, 2019 date that
Verizon submitted additional materials as the last day of the tolling period under 47 C.F.R. §
1.6003(d)(2), arguing that "the record is undisputed that Verizon Wireless did not respond to the

---

[7] Verizon's submission is dated December 17, 2018, but Verizon contends this date was a mistake
and that it submitted the materials on March 12, 2019.  The ZAB Staff Report uses the March 12,
2019 date, and no party disputes the March 12, 2019 date.  *See* Pl.'s Mot. 14 n.9; A.R. 891 (ZAB
Staff Report chronology).

[8] Verizon and Berkeley did not include this calculation in their briefs, but the court calculates the
July 10, 2019 shot clock date as follows: December 17, 2018 + 150 days presumptive deadline =
May 16, 2019.  Berkeley notified Verizon that its application was incomplete on January 16, 2019
and Verizon submitted additional materials on March 12, 2019.  Thus, the shot clock was tolled
from January 17, 2019 (the day after Berkeley notified Verizon that the Application was
incomplete) until March 12, 2019 (55 days).  May 16, 2019 + 55 days = July 10, 2019.

United States District Court
Northern District of California

City's request for further information on Verizon Wireless' noise study until June 11, 2019."
BRN's Mot. 11; *see* A.R. 106-21 (Verizon's June 11, 2019 submission).  Therefore, it contends,
the tolling period under § 1.6003(d)(2) (January 17, 2019 through June 11, 2019) was 146 days.
BRN further contends that the parties also tolled the period July 23, 2019 through July 10, 2020
through the tolling agreement and extensions (354 days).  BRN adds the 150 day presumptive
deadline to the 146-day and 354-day tolling periods (totaling 650 days), yielding a shot clock
deadline of September 30, 2020.[9]  *Id.*

      BRN's position is without merit.  BRN argues that Verizon extended the tolling period
under § 1.6003(d)(2) by submitting additional information regarding the noise study on June 11,
2019.  However, Verizon submitted the noise study information in response to Rincon's May 24,
2019 request.  *See* A.R. 90-91 (Rincon's comments and request for information), A.R. 106-08
(responding to Rincon's May 24, 2019 comments).  Under 47 U.S.C. § 1.6003(d)(2)(iii), a notice
that an application is incomplete and requesting additional information extends the shot clock
deadline only if it is made within 30 days after the application was filed; in this case, that deadline
was January 16, 2019.  Thus, Rincon's May 24, 2019 request did not impact the shot clock
deadline.  Moreover, Berkeley had already deemed the Application complete as of April 11, 2019.
*See* A.R. 132, 891.

      Additionally, BRN's shot clock deadline calculation includes the 354 days between July
23, 2019 and July 10, 2020 based on the tolling agreement and extensions thereto.  However,
under the regulation, the total "shot clock period" is the sum of the presumptively reasonable
period (150 days) plus "[t]he number of days of the tolling period, if any, pursuant to paragraph
(d) of" § 1.6003.  47 C.F.R. § 1.6003(b).  In turn, paragraph (d) provides for tolling due to a timely
notification that an application is incomplete, "[u]nless a written agreement between the applicant
and the siting authority provides otherwise."  47 C.F.R. § 1.6003(b).  The tolling agreement
between Verizon and Berkeley did "provide[ ] otherwise" by specifying a date certain for the shot

---

[9] By the court's own calculation, December 17, 2018 (the date of Verizon's Application) plus 650
days is September 27, 2020.  The resolution of this discrepancy is not material since the court
finds that the shot clock deadline expired on July 10, 2020 as discussed below.

United States District Court
Northern District of California

clock deadline, November 22, 2019, which they extended several times until the final extension to July 10, 2020. BRN offers no authority supporting a different deadline.

### b.     Whether Verizon's Failure-to-Act Claim is Barred by the Statute of Limitations

Having determined that the shot clock deadline was July 10, 2020, the court now turns to the issue of the timeliness of Verizon's failure-to-act claim under the applicable statute of limitations. Berkeley argues that the deadline for Verizon to file a complaint challenging Berkeley's failure to act on the Application was July 27, 2020, but it did not file the complaint until August 6, 2020, rendering the claim untimely. Berkeley raised a statute of limitations defense in its Answer but does not seek summary judgment on the defense; instead, it asserts that Verizon is not entitled to summary judgment on its failure-to-act claim based on disputes of fact as to whether the claim was timely.[10] [*See* Docket No. 59 (Berkeley's Answer) at 10.]

Berkeley's argument is as follows: the original shot clock deadline was July 10, 2019. Verizon contends (and no party disputes) that Berkeley did not take final action on the Application before that date. Therefore, Berkeley argues, the 30-day statute of limitations to challenge the failure to act started running on that date. *See* 47 U.S.C. § 332(c)(7)(B)(v). The parties did not enter a tolling agreement until July 23, 2019, allowing 13 days of the 30-day period to file a lawsuit to expire. *See* Berkeley's Opp'n 15. Berkeley acknowledges the tolling agreement and corresponding extensions that extended the final shot clock deadline to July 10, 2020 but argues "there is a question of fact as to whether the tolling agreements simply tolled the statute of limitations or reset the statute of limitations." *Id.* Specifically, Berkeley argues that the original tolling agreement is "unclear" because "[i]t simply states that 'no limitations period . . . shall commence to run' before the Expiration Date, but fails to explicitly state whether this limitations period" consists of a full 30 days or an abbreviated 17-day period due to the expiration of 13 days between the original July 10, 2019 shot clock deadline and the July 23, 2019 tolling agreement. *Id.* at 16. According to Berkeley, "[n]either case law, the plain language of the TCA, nor the Shot Clock Order hold that an already commenced 30-day period for filing suit resets automatically if

---

[10] BRN does not address this issue in its briefing.

1    the parties enter into a mutually agreeable tolling agreement," and "Verizon fails to provide any

2    undisputed facts showing that the parties agreed to reset the already triggered statute of

3    limitations." *Id*. at 15-16.  Berkeley contends that Verizon was required to file its failure-to-act

4    claim by July 27, 2020, or 17 days after the shot clock deadline.

5         Berkeley's argument rests on its interpretation of the provision in the tolling agreement

6    that states "no limitations period for any claim of unreasonable or unlawful delay in processing the

7    Application shall commence to run before [the Extension Date]," which it claims is "unclear."

8    Berkeley's Mot. 16; *see* A.R. 2912.  Notably, Berkeley does not brief the standard the court must

9    apply in interpreting the language of the tolling agreement.  For its part, Verizon disputes that the

10   tolling agreement is ambiguous and contends that interpretation presents a question of law that the

11   court may resolve on summary judgment but does not otherwise brief the applicable standard.

12   Pl.'s Opp'n 4.

13        The tolling agreement does not contain a choice-of-law provision and neither side

14   addressed which law of contract interpretation applies.  "[F]ederal common law applies to the

15   choice of law rule determination" in federal question cases, and "[f]ederal common law follows

16   the approach of the Restatement (Second) of Conflict of Laws."  *Schoenberg v. Exportadora de*

17   *Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991); *accord In re Vortex Fishing Sys., Inc.*, 277

18   F.3d 1057, 1069 (9th Cir. 2002); *see, e.g., Universal Trading & Inv. Co. v. Kiritchenko*, No. C-99-

19   3073 MMC, 2007 WL 2669841, at *12 (N.D. Cal. Sept. 7, 2007), *aff'd sub nom. Universal*

20   *Trading & Inv. Co. v. Kiritchenko*, 346 F. App'x 232 (9th Cir. 2009) (applying federal common

21   law and Restatement (Second) of Conflict of Laws to determine which jurisdiction's law applied

22   to issue of validity of assignment).  Section 204 of the Restatement (Second) of Conflict of Laws

23   ("the Restatement") governs "Construction of Words Used in Contract" and addresses which law

24   governs contract interpretation.  It states:

25        When the meaning which the parties intended to convey by words
         used in a contract cannot satisfactorily be ascertained, the words will
26        be construed

27        (a) in accordance with the local law of the state chosen by the parties,
         or

28

United States District Court
Northern District of California

(b) in the absence of such a choice, in accordance with the local law of the state selected by application of the rule of § 188.

Restatement (Second) of Conflict of Laws § 204 (1971).[11]  However, section 204 applies "only in a limited number of situations."  *Id.*, comment (a).  Specifically, the forum must first attempt to interpret the contract before turning to "local law":

> The forum will first seek to interpret the contract in the manner intended by the parties. It will consider the ordinary meaning of the words, the context in which they appear in the instrument, and any other evidence which casts light on the parties' intentions, including an intention, if any, to give a word the meaning given it in the local law of another state. The forum will apply its own rules in determining the relevancy of evidence, and it will use its own judgment in drawing conclusions from the facts. This process, which is called interpretation in the Restatement of this Subject (see § 224), does not involve application by the forum of its choice-of-law rules.

> When the meaning which the parties intended to convey by words used in a contract cannot satisfactorily be ascertained, the forum must determine the meaning of these words by a process which in the Restatement of this Subject is called construction (see § 224). This process involves the application of the rules of construction of a particular state. Consequently, a choice-of-law problem arises whenever a contract has a substantial relationship to two or more states with different rules of construction.

Restatement (Second) of Conflict of Laws § 204 (1971), comment (a).

Accordingly, under the Restatement, before determining which jurisdiction's law applies to the construction of contract language, the court must first attempt to interpret that language "in the manner intended by the parties."  *See id*.  As noted, the tolling agreement states:

> In order to allow the City to act on the Application without either party risking the loss of important rights, the parties agree that the time period within which the City may act on the Application shall be extended through the Extension Date, and that *no limitations period for any claim of unreasonable or unlawful delay in processing the Application shall commence to run before said date*.

A.R. 2912 (emphasis added).  Verizon contends that the highlighted portion means that the limitations period would not "begin" to run before the Extension Date.  While Berkeley does not set forth a competing interpretation, it appears to argue that the highlighted language means that

---

[11] Section 188 of the Restatement provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties" under certain principles articulated elsewhere in the Restatement, and sets forth the contacts courts should consider in making this determination.

United States District Court
Northern District of California

the limitations period would not "resume running" before the Extension Date.  The court

concludes that the provision unambiguously means that the 30-day limitations period would not

begin to run before the Extension Date, since it uses the term "commence."  The dictionary

definition of "commence" is "to enter upon: begin."  https://www.merriam-

webster.com/dictionary/commence (last accessed Feb. 7, 2023).  Verizon's proffered

interpretation is consistent with the parties' intent as reflected in the stated purpose of the tolling

provision, which was "to allow the City to act on the Application without either party *risking the*

*loss of important rights*."  Had the parties intended to take into account the 13 days that had

elapsed prior to their entering into a tolling agreement, they could have used a term other than

"commence," such as "resume."  Berkeley does not offer any other argument regarding the

parties' intentions, the context of the disputed provision, or any other record evidence in support

of its claim that the provision is unclear or ambiguous, and the court finds no ambiguity.[12]

Accordingly, since the parties agreed that the TCA's 30-day limitations period applicable

to a failure-to-act claim would not begin to run before July 10, 2020, the shot clock deadline,

Verizon's August 6, 2020 complaint was timely.  The court now turns to the merits of the claim.

### c.      The Merits of the Failure-to-Act Claim

As noted, the TCA provides that if a municipality denies a request to construct personal

---

[12] Notably, the outcome would be the same if the court applied California law regarding contract interpretation.  Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting."  Cal Civ. Code § 1636.  "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible."  Cal. Civ. Code § 1639.  "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity," Cal. Civ. Code § 1638, and the words of a contract are to be understood in their "ordinary and popular sense unless used by the parties in a technical sense or a special meaning is given to them by usage." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).  However, "[u]nder California law, even if the written agreement of the parties is clear and unambiguous on its face, the trial judge must consider relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible."  *United States v. King Features Ent., Inc.*, 843 F.2d 394, 398 (9th Cir. 1988).  The language of a contract is considered ambiguous if it is "reasonably susceptible" to more than one interpretation.  *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1994).

Based on the "ordinary and popular sense" of the words "commence to run," the disputed provision clearly and unambiguously means that the 30-day limitations would not "begin to run" before the Extension Date.  Berkeley offers no extrinsic evidence supporting a different "meaning to which the [disputed] language . . . is reasonably susceptible."  Accordingly, the court may interpret the language of the agreement as a matter of law.  *See King Features*, 843 F.2d at 398.

wireless service facilities, the denial "shall be in writing and supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).  Verizon argues that Berkeley failed to act on the Application by the July 10, 2020 shot clock deadline because it did not issue a written denial until September 8, 2020, when it mailed notice of the denial to Version along with a copy of the Denial Resolution.  Pl.'s Mot. 15; *see* A.R. 2746-48, 2707-10.

Berkeley argues that it "issued a written denial for TCA purposes, *at the latest*, when, on or about July 9, 2020, it posted the annotated agenda of its July 7, 2020 City Council meeting on its website," stating that the City Council had adopted the Denial Resolution affirming the ZAB's decision to deny the Application.  Berkeley's Opp'n 16 (emphasis in original); *see* A.R. 3577. Berkeley contends that the annotated agenda is a written document that constitutes a written denial under 42 U.S.C. § 332(c)(7)(B)(iii).[13]

The court need not reach the merits of this dispute because Berkeley previously admitted that it "did not issue any written denial until September 8, 2020."  In the FASC, Verizon expressly alleged that Berkeley failed to issue a written denial of the Application by the shot clock deadline:

> In fact, the City did not issue any written denial until September 8, 2020 – more than a month after this suit was filed – when it mailed a letter to Verizon Wireless stating that the City Council had denied its Application based on the findings in the enclosed Resolution 69,487 N.S. (the "Denial Resolution"). While the Denial Resolution stated that it was adopted on July 7, 2020, it was not mailed or otherwise made available to Verizon Wireless until September 8, 2020, and the minutes of the July 7, 2020, hearing were not approved by the City Council until September 15, 2020.

FASC ¶ 43.  In response to this allegation, Berkeley averred in its Answer only that "the written denial is its own best evidence and speaks for itself."  [Docket No. 59 (Berkeley's Answer) ¶ 43.] It did not otherwise admit or deny the allegation.  For its part, BRN expressly admitted the allegation.  [Docket No. 58 (BRN's Answer) ¶ 43.]  Pursuant to Federal Rule of Civil Procedure 8(b)(6), "[a]n allegation--other than one relating to the amount of damages--is admitted if a responsive pleading is required and the allegation is not denied."  Accordingly, Verizon's allegation that Berkeley "did not issue any written denial [of the Application] until September 8,

---

[13] BRN does not address these arguments in its briefing.

United States District Court
Northern District of California

1    2020" is deemed admitted by Berkeley.  *See* Fed. R. Civ. P. 8(b)(6); *Legal Aid Soc'y of Alameda*

2    *Cnty. v. Brennan*, 608 F.2d 1319, 1334 (9th Cir.1979) ("The allegations are to be treated as

3    admitted since not denied," citing previous version of Rule 8(b)(6)).  Berkeley's admission

4    forecloses its argument that posting the annotated agenda on July 9, 2020 constituted a written

5    denial.

6           As set forth above, the TCA requires a municipality to act on a request to construct

7    personal wireless service facilities "within a reasonable period of time after the request is duly

8    filed with" such a municipality, 47 U.S.C. § 332(c)(7)(B)(ii), and a municipality that fails to act on

9    an application "on or before the shot clock date for the application . . . is presumed not to have

10   acted within a reasonable period of time." 47 C.F.R. § 1.6003(a).  The conclusion that Berkeley

11   issued a written denial nearly two months after the shot clock deadline does not end the court's

12   analysis, however, since the FCC recognized in the *Shot Clock Order* "that 'certain cases may

13   legitimately require more processing time' and therefore provided that the deadlines could be

14   extended by agreement of the applicant or that the shot clock may be tolled to obtain certain

15   required information."  *Upstate Cellular Network v. City of Auburn*, 257 F. Supp. 3d 309, 315

16   (N.D.N.Y. 2017) (quoting *Shot Clock Order*, 24 F.C.C. Rcd. 13994, 14010, ¶¶ 42).  "The FCC

17   also clarified that . . . [a] 'local authority will have the opportunity, in any given case that comes

18   before a court, to rebut the presumption that the established timeframes are reasonable' based

19   upon the unique circumstances in individuals' cases.'"  *Id.* (quoting *Shot Clock Order*, 24 F.C.C.

20   Rcd. 13994, 14010-11, ¶¶ 42, 44).  "Therefore, if the presumption is established, a court must

21   review the reasons provided by the municipality for the delay and adjudge its reasonableness."

22   *Verizon Wireless of E. LP v. Town of Wappinger*, No. 20-CV-8600 (KMK), 2022 WL 282552, at

23   *13 (S.D.N.Y. Jan. 31, 2022).

24           Here, Berkeley does not attempt to rebut the presumption that the July 10, 2020 shot clock

25   deadline was reasonable and does not otherwise argue that its delay in issuing a written denial was

26   reasonable.

27           BRN contends that the timing of the September 8, 2020 written denial was reasonable

28   under the circumstances, arguing that Verizon delayed in responding to Berkeley's original

request for additional information and later delayed the review process by requesting

postponement of the original October 2019 City Council hearing on the appeal and entering into

tolling agreements to extend the shot clock deadline.  BRN also notes that Verizon submitted "a

vast amount of allegedly 'new' briefing" and other data only one week before the July 7, 2020

City Council hearing and then "insisted on going forward with its City Council appeal on July 7,

2020 in the midst of a pandemic," negatively impacting Berkeley's ability to issue a written

denial.  *See* BRN's Mot. 13-15.  Notably, Berkeley does not point to any of these factors as the

reason for its delay in issuing a timely denial.

BRN's arguments are not persuasive.  The time Verizon spent responding to Berkeley's

request for initial information was accounted for when the shot clock was tolled under 47 C.F.R. §

1.6003(d)(2).  Both Verizon and Berkeley proposed and agreed to shot clock extensions for

various reasons, including the need for more time to accommodate Berkeley's appeal process, to

allow Verizon to submit additional materials in support of the Application, and to take into

account delays caused by the COVID-19 pandemic.  *See* A.R. 2909 (Verizon proposing extension

"to accommodate the City's appeal process"); 2913 (Verizon proposing extension to accommodate

Verizon's "review of alternatives, a third-party peer review of materials, and a Council appeal

hearing"); 3011-12 (Berkeley proposing extension, writing "[w]e will get the appeal back on track

when things return to some semblance of normal"); 3043-44 (Berkeley noting concerns about

"limited and imperfect" "opportunities for public participation" and proposing extension to

accommodate a special meeting of the City Council to take into account the concerns); 3060-61

(Berkeley proposing "brief extension" to accommodate new, July 7, 2020 date for City Council

meeting).

As to the new materials Verizon submitted one week before the July 7, 2020 City Council

hearing, BRN contends that Berkeley "kept secret" this material from "BRN until the last minute,"

even though BRN had asked to be served with new material in advance.  BRN's Mot. 13.

However, BRN does not explain how Berkeley's failure to notify BRN of the material impacted

Berkeley's ability to timely issue a written denial, which is the relevant issue.  Nothing in the

administrative record supports that these materials impacted the timeliness of Berkeley's written

1    denial.  In fact, the Council staff report appeared to reference the Statement of Minimum

2    Functional Height submitted on July 1, 2020, suggesting that Berkeley reviewed the new material

3    in advance of the July 7, 2020 hearing.  *See* A.R. 1627 ("[t]he additional information provided by

4    the applicant does not discuss whether lowering the height of the proposed facility would

5    materially inhibit the introduction of new services or the improvement of existing services").

6        BRN also cites cases that it states "have held that the pandemic must be taken into account

7    in assessing the reasonableness of any delay in processing a cell tower application."  BRN's Mot.

8    15.  However, none of the cases cited by BRN held that the pandemic was a factor in rebutting the

9    presumption that a shot clock deadline was reasonable.  Instead, after concluding that the

10   defendant municipalities had violated 47 U.S.C. § 332(c)(7)(B)(ii), the courts ordered them to act

11   by specific deadlines that the courts expressly selected to take into account the impact of the

12   pandemic.  *See Verizon Wireless of E. LP*, 2022 WL 282552, at *24 n.18 (ordering town to take

13   action within 60 days, noting that "[i]n normal times, the deadline would have been 30 days"); *Up

14   State Tower Co. v. City to N. Tonawanda, New York*, No. 19-CV-01082(JJM), 2020 WL 9848450,

15   at *8 n.5 (W.D.N.Y. Sept. 28, 2020) (ordering city to render a decision within 60 days and noting

16   that "this timeframe accounts for conditions caused by the current COVID-19 pandemic"); *Crown

17   Castle Fiber LLC v. City of Charleston*, 448 F. Supp. 3d 532, 546 n.6 (D.S.C. 2020) (ordering city

18   to act on pending applications within 90 days, recognizing "that 90 days is a long period of time"

19   and that "[i]n normal times, the deadline would have been 30 days.").  In fact, one of the cases

20   also found that the tolling agreements entered into by the parties had already taken into account

21   the impact of the pandemic.  *Verizon Wireless of E. LP*, 2022 WL 282552, at *17.

22       In sum, the court concludes that Berkeley and BRN have failed to rebut the presumption

23   that the July 10, 2020 shot clock deadline was reasonable.  Accordingly, as Berkeley failed to

24   issue a written decision on the Application by the shot clock deadline, Verizon is entitled to

25   summary judgment on its failure-to-act claim under 47 U.S.C. § 332(c)(7)(B)(ii).

26       **B.      Claim Two: Substantial Evidence**

27       Verizon's second claim is that Berkeley's denial is not based on substantial evidence.  It

28   contends that the Denial Resolution is an impermissible post hoc rationalization that the court

should not consider.  In the alternative, it argues that the Denial Resolution is not supported by substantial evidence.  Pl.'s Mot. 16-21.

### 1. Whether the Denial Resolution is a Post Hoc Rationalization

Verizon first argues that the court should disregard the Denial Resolution because it was issued on September 8, 2020, over one month after Verizon filed this lawsuit, and thus constitutes a post hoc rationalization.  Pl.'s Mot. 16.  In support, it cites *Roswell*, in which the Supreme Court held "localities must provide or make available their reasons" when they deny applications to place, construct, or modify personal wireless service facilities but that the "reasons need not appear in the written denial letter or notice provided by the locality.  Instead, the locality's reasons may appear in some other written record so long as the reasons are sufficiently clear and are provided or made accessible to the applicant essentially contemporaneously with the written denial letter or notice." *Roswell*, 574 U.S. at 295.  The denial and reasons should be released within the applicable "reasonable period of time"; i.e., by the shot clock deadline. *See id*. at 304-05.

Chief Justice Roberts dissented, rejecting the wireless provider's contention that the term "decision in writing" in 47 U.S.C. § 332(c)(7)(B)(iii) "inherently demands a statement of reasons." *Id*. at 311 (Roberts, C.J., dissenting).  According to Chief Justice Roberts, the term "demand[s] nothing more than what it says: a written document that communicates the town's denial." *Id*. at 312.  The majority addressed Chief Justice Roberts's dissent in a footnote, expressing its concern that such an approach could give municipalities an unfair advantage and complicate a reviewing court's task:

> the dissent would fashion a world in which a locality can wait until a lawsuit is commenced and a court orders it to state its reasons. The entity would thus be left to guess at what the locality's written reasons will be, write a complaint that contains those hypotheses, and risk being sandbagged by the written reasons that the locality subsequently provides in litigation after the challenging entity has shown its cards. The reviewing court would then need to ensure that those reasons are not *post hoc* rationalizations, see *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), but the dissent offers no guidance as to how a reviewing court that has never seen near-contemporaneous reasons would conduct that inquiry.

*Id.* at 304 n.3.

Concerns about sandbagging are not present here because Berkeley sent Verizon a copy of

United States District Court
Northern District of California

its reasons for the denial (i.e., the Denial Resolution) with its September 8, 2020 written denial. *See* A.R. 2746-48.  The Denial Resolution largely mirrors the findings supporting the denial that the City Council read into the record during the July 7, 2020 City Council meeting.  *Compare* A.R. 2665-2666 (Tr.) *with* A.R. 2709-10.  In this way, the facts of this case are different from those in *Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1220 n.9 (11th Cir. 2002), on which Verizon relies.  In that case, the court refused to consider the reasons for a municipality's denial of an application for a proposed wireless service facility because they "were not espoused prior to the commencement of [the] action," holding, "Appellant may not rely on rationalizations constructed after the fact to support the denial of Appellee's application."  *See also Nextel of New York, Inc. v. City of Mount Vernon*, 361 F. Supp. 2d 336, 342 (S.D.N.Y. 2005) (refusing to consider "concerns about adverse aesthetic impacts" of a proposed wireless service facility because they "were not mentioned in the City's written decisions, and cannot be raised now."); *MetroPCS New York, LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 423 (S.D.N.Y. 2010) (rejecting municipality's concern about the safety of the proposed wireless service facility because "it was not raised during the application process and appears to be a *post hoc* rationalization for denying the application.").

While Berkeley did not provide the Denial Resolution to Verizon until after it filed this lawsuit, the Denial Resolution reflected the reasons already stated by the City Council at the July 7, 2020 meeting, and Verizon does not cite any authority for its assertion that the court may not consider reasons for a denial issued after the initiation of litigation under these circumstances.[14] The court concludes that it may consider the Denial Resolution because it is not a post hoc rationalization for denying the Application.

### 2.  Whether the Denial Was Based on Substantial Evidence

#### a.  Substantial Evidence Standard

The TCA provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be

---

[14] As discussed in Section V.C.2.b below, however, Berkeley may not rely on purportedly feasible alternatives to the proposed facility that were not part of the reasons supporting the July 7, 2020 denial or the Denial Resolution in this motion.

1    in writing and supported by substantial evidence contained in a written record."  47 U.S.C. §

2    332(c)(7)(B)(iii).  For purposes of the TCA, the substantial evidence inquiry "requires a

3    determination whether the zoning decision at issue is supported by substantial evidence in the

4    context of applicable state and local law."  *MetroPCS, Inc. v. City & Cnty. of San Francisco*, 400

5    F.3d 715, 723-24 (9th Cir. 2005), *abrogated on other grounds in T-Mobile S., LLC v. City of

6    Roswell, Ga.*, 574 U.S. 293 (2015).  As the Ninth Circuit has explained, courts "must take

7    applicable state and local regulations as [they] find them and evaluate the [municipality's]

8    decision's evidentiary support (or lack thereof) relative to those regulations."  *Id*. at 724.  This

9    requires determining "(1) whether the City's decision was authorized by local law and, if it was,

10   (2) whether it was supported by a reasonable amount of evidence."  *Sprint PCS Assets, L.L.C. v.

11   City of Palos Verdes Ests.*, 583 F.3d 716, 721 (9th Cir. 2009).

12       "[S]ubstantial evidence implies less than a preponderance, but more than a scintilla of

13   evidence.  It means such relevant evidence as a reasonable mind might accept as adequate to

14   support a conclusion."  *MetroPCS*, 400 F.3d at 725 (quotation marks omitted; quoting *Cellular

15   Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 495 (2d Cir. 1999)).  This standard is "deferential"

16   and courts may "neither engage in [their] own fact-finding nor supplant the [decisionmaker's]

17   reasonable determinations."  *Id*. (quoting *Oyster Bay*, 166 F.3d at 494) (first alteration in original).

18   "A defendant need only show substantial evidence for one reason for denial, in view of the local

19   regulations, rather than for each reason for denial."  *New Cingular Wireless PCS, LLC v. County

20   of Marin*, No. 20-cv-07915-SI, 2021 WL 5407509, at *6 (N.D. Cal. Nov. 18, 2021) (citing

21   *Charter Commc'ns, Inc. v. County of Santa Cruz*, 304 F.3d 927, 933 (9th Cir. 2002)).

                                **b.      Analysis**

23       The Denial Resolution lists seven separate findings.  A.R. 2709-10.  Findings 1-3 focus on

24   visual impacts of the proposed facility, i.e., aesthetic concerns, while findings 4 and 5 focus on the

25   height of the proposed facility.  Finding 6 is directed at whether Verizon has shown "that denial of

26   the proposed project would effectively prohibit the provision of wireless service" and is discussed

27   below in connection with the effective prohibition claim (claim three).  Finding 7 is not an

28   independent finding, but states that "the record has ample evidence to support each one of these

United States District Court
Northern District of California

elements of this denial." A.R. 2710.

Finding 1 reads:

> Pursuant to Berkeley Municipal Code Sections 23C.17.100.B.2.a and 23C.17.100.B.2.b, the applicant did not demonstrate that the proposed project will not be readily visible, or that it is not feasible to incorporate additional measures that would make the facility not readily visible.

>> a. The proposed antenna is visible from a public park by a person with normal vision, and as distinguished as an antenna or other component of a wireless telecommunication facility, due to the fact that it stands out as a prominent feature of the landscape, protrudes above or out from the ridgeline, or is otherwise not sufficiently camouflaged or designed to be compatible with the appurtenant architecture or building materials.

>> b. The proposed antenna is visible from street level or from the main living area of a legal residence in a residential district by a person with normal vision, and as distinguished as an antenna or other component of a wireless telecommunication facility, due to the fact that it stands out as a prominent feature of the landscape, protrudes above or out from the ridgeline, or is otherwise not sufficiently camouflaged or designed to be compatible with the appurtenant architecture or building materials because it is possible to incorporate additional measures.

>> c. Pursuant to Berkeley Municipal Code Section 23C.17.050.B, the City Council is unable to make the findings required under Berkeley Municipal Code Section 23C.17.100.[15]

A.R. 2709.

Finding 2 is that "Verizon "failed to present substantial evidence that the project facility is designed and located to minimize their visibility to the greatest extent feasible, or that the proposed project would use the smallest and least visible antennas feasible to accomplish the applicant's coverage or capacity objective," citing BMC section 23C.17.070.B. *Id.* Finding 3 is that Verizon "did not demonstrate that the proposed project meets the requirements of BMC

---

[15] BMC section 23C.17.050.B provides that "[n]o wireless communications facilities shall be sited on or above a ridgeline or at any other location readily visible from a public park, unless the Zoning Adjustments Board makes the applicable findings required in Section 23C.17.100." As discussed above, BMC section 23C.17.100 requires that the ZAB or Zoning Officer find that the proposed facility "will not be readily visible" or that "it is not feasible to incorporate additional measures that would make the facility not readily visible," among other required findings. *See* BMC § 23C.17.100.2.a, b.

Section 23C.17.070.C (Design Requirements), which requires that 'no readily visible antenna shall be placed at a location where it will impair a significant or sensitive view corridor' . . . [and] meets the requirements of BMC Section 23C.17.070.C.3 that the proposed monopole was designed to be the minimum functional height and width required to support the proposed antenna installation . . ." *Id.*

"[E]ven under a substantial evidence review, zoning decisions based on aesthetic concerns can be valid," *Voice Stream PCS I, LLC v. City of Hillsboro*, 301 F. Supp. 2d 1251, 1257 (D. Or. 2004), and the Ninth Circuit has held that municipalities have a "default power" to "regulate aesthetics" under the California Constitution. *Palos Verdes Ests.*, 583 F.3d at 722-23. "[U]nder the TCA, [a zoning board] is entitled to make an aesthetic judgment as long as the judgment is 'grounded in the specifics of the case,' and does not evince merely an aesthetic opposition to cell-phone towers in general." *Voice Stream*, 301 F. Supp. 2d at 1258. *See also T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 994 (listing aesthetics as a "legitimate concern[ ] for a locality," citing *Voice Stream*, 301 F. Supp. 2d at 1258). "Accordingly, when the evidence specifically focuses on the adverse visual impact of [a cell phone tower] at the *particular location at issue* more than a mere scintilla of evidence generally will exist." *Voice Stream*, 301 F. Supp. 2d at 1258 (emphasis in original).

Verizon does not argue that findings 1-3 were not authorized by local law. Accordingly, the next step is whether the findings were "supported by a reasonable amount of evidence." *Palos Verdes Ests.*, 583 F.3d at 721.

Finding 1 focuses on the "readily visible" requirements in BMC section 23C.17.100.B.2. BMC defines "readily visible" as follows:

> A wireless telecommunications facility is readily visible if it can be seen from street level or from the main living area of a legal residence in a residential district or from a public park by a person with normal vision, and distinguished as an antenna or other component of a wireless telecommunication facility, due to the fact that it stands out as a prominent feature of the landscape, protrudes above or out from the building or structure ridgeline, or is otherwise not sufficiently camouflaged or designed to be compatible with the appurtenant architecture or building materials. For purposes of this definition, "main living area" means the living and dining and similar areas of a dwelling, but not bedrooms, bathrooms or similar areas.

1    BMC § 23F.04.010.  Finding 2 addresses Verizon's purported failure to show that the proposed

2    facility "is designed and located to minimize" visibility to the greatest extent feasible or that it

3    would "use the smallest and least visible antennas feasible."  Finding 3 is directed at the proposed

4    facility's purported "impair[ment] of a significant or sensitive view corridor" and whether it "was

5    designed to be the minimum functional height and width required."

6         Verizon argues that finding 1 is not supported by substantial evidence because "[b]oth

7    planning staff and the City's expert consultant found that the Project will not be 'readily visible,'"

8    citing the ZAB Staff Report, TLF's May 7, 2020 report, and ZAB planning staff's testimony at the

9    June 27, 2019 ZAB hearing.  Pl.'s Opp'n 19 (citing A.R. 894, 1731-34, and 2770).  Verizon

10   argues generally that the City Council failed to "confront" this evidence and offered no reason to

11   reject it.  It does not specifically address findings 2 and 3.  *See id*.

12        The court concludes that findings 1-3 are supported by substantial evidence.  While the

13   ZAB Staff Report concluded that the monopine design would "not be readily visible," it also noted

14   that "the proposed faux tree would require monitoring and maintenance to ensure that the faux

15   branches designed to obscure the antennas are in good condition and not damaged due to

16   weather."  A.R. 895.  Additionally, the Council staff report concluded that "[it] is possible that

17   neighbors and park users could see the pole," although it noted that it was "not clear that it would

18   be obtrusive."  A.R. 1627.  One of the photosimulations Verizon submitted with the Application

19   clearly indicates that the facility would be visible from Codornices Park, which is located directly

20   to the north of Berryman Reservoir.  *See* A.R. 13 (photosimulation with green highlights,

21   including Codornices Park), 2783 (Verizon representative explaining at the ZAB hearing that

22   "[a]ll the spots that are in green are places where you would be able to see the tower from.").

23   Further, a Verizon representative admitted at the ZAB hearing that he could not identify the

24   species of the trees at Berryman Reservoir, A.R. 2790, so it was not clear whether the proposed

25   monopine matches the real trees at the site.

26        Neighboring residents voiced numerous concerns at the ZAB hearing about the aesthetics

27   and visibility of the proposed facility, including its incompatibility with the neighborhood and

28   natural setting of the EBMUD property and neighboring Codornices Park.  *See* A.R. 2805 (stating

United States District Court
Northern District of California

1   the proposed facility was "incompatible with the character of the neighborhood); 2808 (describing

2   the trees at the site, explaining that only oak trees are near the proposed site and an evergreen

3   "would really stand out" there); 2811-12 (some neighbors "will now have a view of a park and an

4   industrial cell tower" and that the tower "will be visible from outside the reservoir berm.  A fake

5   tree is not going to fool anyone into thinking it's pretty"); 2836-37 (explaining that the tree heights

6   in the simulations were "off by like 30 feet.  They're only 25 to 30 feet high and the plans say

7   they're like 50 feet high"); 2841-42 (stating the proposed facility "is inconsistent with the

8   character of this neighborhood," asserting that "[p]utting up a fake ugly 50-foot tall pine tower in a

9   location directly in front of residents' unobstructed view of the bay would greatly diminish the

10  value of their property"); 2844 (describing photosimulations as "deceptive because you don't get

11  the effect of the distance . . . the pole that's going to be there [will] really stand out.  It's not going

12  to be at all disguised"); 2848 ("this is not going to be fitting with the park setting").

13          Residents also raised concerns about being able to view the proposed facility from

14  Codornices Park.  *See* A.R. 2850-51 (the proposed facility would "disturb[ ] the esthetic of the

15  neighborhood, the whole–the whole complex of Codornices Park, and the rose garden," stating the

16  proposed facility is "basically about six feet away from the path for entering Codornices Park");

17  2819 (the proposed facility "will stand out like a sore thumb in this clearing created for the

18  reservoir," noting that in comparison, the reservoir tank is "carefully concealed" and "not visible

19  from any of the public streets or parks").  A number of ZAB members also expressed concerns

20  that the Application did not adequately address the views of the proposed facility from Codornices

21  Park.  A.R. 2864-65, 2867-68, 2875.

22          At the City Council hearing, an EBMUD representative testified about the "significant

23  design process" EBMUD undertook to mitigate the reservoir's impact on the aesthetics of the

24  neighborhood in which it is located.  This included retaining a "renowned landscape architect" to

25  landscape the entire site with ground cover, trees, and shrubs, and meeting with neighborhood

26  residents.  The representative testified that EBMUD placed the facility at a level at which it would

27  not impact views and observed, "[an] artificial tree seems inconsistent."  A.R. 2630-32; *see also*

28  A.R. 2831-32 (statement at ZAB hearing about the extensive process EBMUD went through to

35

1   construct the reservoir, including collaboration with community).  Neighboring residents again

2   commented at the City Council hearing about the aesthetics of the proposed facility.  *See* A.R.

3   2636 (stating the park has "a woodland feel.  This is an overlook and having a faux tree is

4   antithesis of what we have here . . . a green pole or fake tree won't make anyone think it is pretty";

5   noting, visitors of "the grassy field at the park . . . will see a cell tower"); 2637 ("it is not a

6   camouflage, it would be recognized as a cell tower"); 2643 (describing "the natural feel of the

7   park"); 2644 ("the cell tower would loom above the playing field.  The path along the reservoir

8   would be right at the base of the industrial tower.").

9       Under the deferential standard set forth in *MetroPCS*, the court concludes that there is

10  substantial evidence to support the City Council's finding 1 that Verizon failed to demonstrate that

11  the proposed facility would not be readily visible, including readily visible "from a public park,"

12  since it was a fake tree protruding above a natural environment.  Such evidence includes extensive

13  public comments about both the aesthetics of the proposed facility and its proximity to Codornices

14  Park as described above, which were not simply "general, unsubstantiated" concerns but instead

15  "considered the specific scene in which the proposed tower would appear."  *Voice Stream*, 301 F.

16  Supp. 2d at 1258.

17      The court also concludes that there is substantial evidence to supporting finding 2 that

18  Verizon failed to show that it was "not feasible to incorporate additional measures that would

19  make the facility not readily visible."  Verizon's initial application proposed a 50-foot monopole

20  disguised as an evergreen, which was a species of tree which may not have matched the other trees

21  at the site.  Berkeley's planning staff subsequently recommended an un-camouflaged pole painted

22  green in lieu of the monopine design, which the ZAB rejected.  Then, less than a week before the

23  City Council hearing, Verizon submitted an entirely new alternative design for the proposed

24  facility, a 45-foot water tank.  In sum, Verizon's efforts to develop alternative design ideas to

25  minimize the visibility of the proposed facility and address the concerns of the ZAB and

26  community members fell short of the "greatest extent feasible" standard set forth in BMC §

27  23C.17.070(B).  *See, e.g.*, A.R. 2831-32 (describing the extensive design and consultation process

28  EBMUD had previously undertaken at the same site when constructing the reservoir).

United States District Court
Northern District of California

1    Substantial evidence also supports finding 3 that Verizon had not demonstrated that the

2    proposed facility "would use the smallest and least visible antennas feasible."  For example,

3    Verizon's representative admitted at the ZAB hearing that Verizon might be able to build a tower

4    that was less than 50 feet tall.  A.R. 2787.  Verizon later submitted the Statement of Minimum

5    Functional Height, explaining that the proposed facility "requires an antenna centerline of 40.75

6    feet to serve the significant gap," A.R. 1579, but the submission does not explain why it is

7    necessary to construct a 50-feet pole to accommodate a shorter, 40.75-feet antenna centerline, and

8    Verizon proposed an alternative water tank design that was only 45 feet tall.  *See* A.R. 1559; *see*

9    *also* A.R. 1627 (portion of Council staff report stating, "[t]he additional information provided . . .

10   does not discuss whether lowering the height of the proposed facility would materially inhibit the

11   introduction of new services or the improvement of existing services").

12       In sum, the court concludes that the objections and evidence in the administrative record

13   go beyond "generic objections" about aesthetics, *see* Pl.'s Opp'n 20, and are grounded in "the

14   specifics of the case."  *See Voice Stream*, 301 F. Supp. 2d at 1260 (citation omitted).  Berkeley's

15   decision as to findings 1-3 is supported by substantial evidence.  *See id*. at 1259 ("[t]he court's

16   role" in performing a substantial evidence review "is not to interject its own judgment, but rather

17   to apply the deferential standard of substantial evidence to the city's judgment.").  Because at least

18   one of the findings was "authorized by local regulations and supported by substantial evidence, it

19   is unnecessary to consider the evidence supporting other potential grounds for the City's decision"

20   with respect to findings 4-6.  *MetroPCS*, 400 F.3d at 726.  BRN's motion for summary judgment

21   on the substantial evidence claim under 47 U.S.C. § 332(c)(7)(B)(iii) is granted.  Verizon's motion

22   for summary judgment on this claim is denied.

23       **C.    Claim Three: Effective Prohibition**

24       Verizon's third claim is that Berkeley's denial of the Application was unlawful because it

25   had the effect of prohibiting Verizon from providing personal wireless services in violation of 47

26   U.S.C. § 332(c)(7)(B)(i)(II).  The TCA states that "[t]he regulation of the placement, construction,

27   and modification of personal wireless service facilities by any State or local government or

28   instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of

United States District Court
Northern District of California

37

1   personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).  The statute defines the term

2   "personal wireless services" to mean "commercial mobile services . . . and common carrier

3   wireless exchange access services" and "personal wireless service facilities" to mean "facilities for

4   the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(C)(i), (ii).

5          As a preliminary matter, BRN argues that it is entitled to summary judgment on the

6   effective prohibition claim because Verizon's Application is not subject to 47 U.S.C. §

7   332(c)(7)(B)(i)(II).  According to BRN, Verizon states in the Application that it "is proposing to

8   provide [4G] LTE service from this facility," which "is a 'data only' service," and that "[w]hile

9   voice telephone service will ultimately be provided from the proposed site, that service is just any

10  other service that uses data, like e-mail or web browsing, or video."  BRN's Mot. 24 (citing A.R.

11  6).  BRN's argument is difficult to follow.  BRN appears to contend that Verizon's statement in

12  the Application is an admission that the services at issue are mobile broadband internet services,

13  which are not "commercial mobile services" and therefore do not satisfy the statutory definition of

14  "personal wireless services."  *See id*. at 24-28.  In other words, BRN seems to argue that the

15  Application does not seek to provide communications services, "only 4G LTE internet services,"

16  and thus Verizon cannot establish a claim that Berkeley's decision had the "effect of prohibiting

17  the provision of personal wireless services."  *Id*. at 27-28; *see* 47 U.S.C. § 332(c)(7)(B)(i)(II).

18         BRN's argument is not persuasive.  In *In the Matter of Restoring Internet Freedom*, 33

19  F.C.C. Rcd. 311, 425 at ¶ 190 (2018), the FCC confirmed that "cell towers and other forms of

20  network equipment can be used 'for the provision' of both personal wireless services and wireless

21  broadband Internet access on a commingled basis."  Accordingly, it confirmed that such facilities

22  fall under the definition of "personal wireless service facilities" set forth in 47 U.S.C. §

23  332(c)(7)(ii):

24              Consistent with the statutory provisions and Commission precedent,
             we consider infrastructure that will be deployed for the provision of
25           personal wireless services . . . to be "facilities for the provision of
             personal wireless services" and therefore subject to section 332(c)(7)
26           as "personal wireless service facilities" even where such facilities also
             may be used for broadband Internet access services.

27  *Id*.

28         Here, the Application explains the service that will be provided at the proposed facility:

United States District Court
Northern District of California

38

1
2
3
4
5

> Verizon is proposing to provide LTE service from this facility.  Please note that LTE is a "data only" service, for which the term "minutes of use" has no meaning.  The throughput or capacity of an LTE site is not measured in terms of the number of telephone calls, or the number of minutes of telephone usage, or blocked or dropped telephone calls.  While voice telephone service will ultimately be provided from the proposed site, that service is just any other service that uses data, like e-mail or web browsing, or video.

6   A.R. 6.  The issue was addressed and clarified at the ZAB hearing.  After a ZAB member stated, "I

7   thought it was interesting there were comments made alleging that the application was only for

8   data, not voice," a Verizon engineer stated the following:

9
10
11

> Actually, it's the same.  With 4G LTE technology, voice and data are all data.  It's called VLTE.  Our voice service is VLTE, which is voice over LTE.   And it's data/call.   It's not like the traditional old technologies, which is separate from data.  It's still data.

12   A.R. 2855.  BRN does not address this evidence or point to anything in the record to support its

13   claim that the Application does not seek to provide "personal wireless services."  Accordingly, its

14   motion is denied on this ground.  *See, e.g., Crown Castle NG E. LLC v. Town of Hempstead*, No.

15   CV 17-3148 (GRB), 2018 WL 6605857, at *6 (E.D.N.Y. Dec. 17, 2018) (observing that "4G

16   nodes designed to connect with cellular phones . . . allow mobile, handheld telephones to utilize

17   the national telephone network to place and receive calls to other mobile and landline telephones.

18   Thus, the services provided in connection with these nodes constitute 'personal wireless services'"

19   under the TCA).

20          Turning to the merits, the Ninth Circuit uses a two-pronged analysis to evaluate an

21   effective prohibition claim.  Under this analysis, the provider must show (1) "a 'significant gap' in

22   service coverage" and (2) "the lack of available and technologically feasible alternatives."

23   *Anacortes*, 572 F.3d at 995-96.  When evaluating an effective prohibition claim, courts review the

24   administrative record de novo without "deference to local findings."  *Los Angeles SMSA Ltd.*

25   *P'ship v. City of Los Angeles*, No. 2:16-cv-04954-FLA (SKx), 2021 WL 3741539, at *4 (C.D. Cal.

26   Aug. 24, 2021) (collecting cases).

27                    **1.  Significant Gap**

28          Verizon argues that it presented "uncontroverted" evidence demonstrating the existence of

United States District Court
Northern District of California

1    a significant gap, citing the March 5, 2020 RF Statement in which an engineer described "a lack of

2    in-building coverage in the north Berkeley hills and barely any in-vehicle coverage."  Pl.'s Mot.

3    22 (citing A.R. 1584).  It also cites the TLF report in which TLF concluded that "there are

4    underserved areas within the claimed gap area that are likely to be subject to reducing service

5    levels if a new nearby cell site is not constructed . . ." *Id*. at 22-23 (citing A.R. 1718).

6         "The significant gap prong is satisfied 'whenever a provider is prevented from filling a

7    significant gap in *its own* service coverage.'" *Am. Tower Corp. v. City of San Diego*, 763 F.3d

8    1035, 1056 (9th Cir. 2014) (emphasis in original) (quoting *MetroPCS*, 400 F.3d at 733).

9    "[S]ignificant gap determinations are extremely fact-specific inquiries that defy any bright-line

10   legal rule." *Palos Verdes Ests*., 583 F.3d at 727 (quoting *MetroPCS*, 400 F.3d at 733).

11        There is conflicting evidence in the record as to whether there is a significant gap in

12   coverage.  At the City Council hearing, opponents of the Application presented Berkeley with data

13   from RootMetrics, described as "an independent mobile analytics firm."  A.R. 2219.  RootMetrics

14   concluded that there was "[g]ood all around" coverage with "[n]o bad or poor areas at all

15   anywhere" on a map of the relevant area.  A.R. 2220.  It also cited "Verizon's interactive map,"

16   which it claimed "shows excellent [4G LTE] coverage."  A.R. 2223.  Verizon acknowledges the

17   RootMetrics data but argues that its "methods are not as accurate as the industry-standard network

18   design tools that Verizon engineers rely on" and dismisses this evidence as not "competent" or

19   "substantial."  Pl.'s Mot. 23.  However, as Berkeley correctly observes, the court cannot weigh

20   evidence or make credibility determinations on a motion for summary judgment.  *See City of*

21   *Pomona*, 750 F.3d at 1049.  Moreover, the RootMetrics data is not the only evidence that

22   contradicts Verizon's RF Statement about the existence of a significant gap.  Neighboring

23   residents stated at public hearings that they did not experience the type of coverage issues that

24   Verizon claimed were present in the area.  *See* A.R. 2785-86 (describing coverage as "actually

25   pretty good right now"); 2821 ("[c]ell coverage is great in my home, in my car, and outside.").

26   Further, the TLF report included the statement, "there are areas within the claimed gap that have

27   adequate Verizon signal strength to provide personal wireless services, but other areas that do

28   not."  A.R. 1748.

United States District Court
Northern District of California

1       In sum, there are "conflicting contents of the record" as to whether a significant gap in

2   coverage exists.  Summary judgment on the first prong of the effective prohibition test is therefore

3   denied.  *See MetroPCS*, 400 F.3d at 733-34.

### 2.   Filling the Gap

4

5       The second "feasibility" prong of the effective prohibition test is evaluated under a "least

6   intrusive means" standard, "which 'requires that the provider show that the manner in which it

7   proposes to fill the significant gap in services is the *least intrusive on the values that the denial*

8   *sought to serve*.'"  *Am. Tower*, 763 F.3d at 1056 (emphasis in original) (quoting *Anacortes*, 572

9   F.3d at 995).  The provider must make "a prima facie showing of effective prohibition by

10  submitting a comprehensive application, which includes consideration of alternatives, showing

11  that the proposed [facility] is the least intrusive means of filling a significant gap."  *Anacortes*, 572

12  F.3d at 998.  If the provider makes such a showing, the burden of proof shifts to the municipality

13  to "show that there are some potentially available and technologically feasible alternatives."  *Id*.

14  The provider is then entitled "to dispute the availability and feasibility of the alternatives favored

15  by the locality."  *Id*.

### a.   Verizon's Prima Facie Showing

16

17      Evaluating whether a proposed facility is the "least intrusive means" of filling a significant

18  gap in services requires an assessment of available and feasible alternatives.  *Anacortes*, 572 F.3d

19  at 998.  A provider makes a prima facie showing that a proposed facility is the "least intrusive

20  means" of filling a purported gap in coverage where its application "includes consideration of

21  alternatives, showing that the [proposed facility] is the least intrusive means of filling" the gap.

22  *Id*.  Relevant considerations include whether alternatives are "technologically feasible, leasable,

23  zoneable and buildable."  *T-Mobile W. Corp. v. City of Huntington Beach*, No. CV 10-2835 CAS

24  EX, 2012 WL 4867775, at *18 (C.D. Cal. Oct. 10, 2012) (citing *Anacortes*, 572 F.3d at 998, 999).

25  "To be technologically feasible, the proposed site must be able to address the gap in coverage."

26  *Id*.  "To be feasible, a site must be leasable," meaning that "the property owner must be willing to

27  lease space for the" proposed facility, and to be "zoneable," the site "must be zoned to allow for

28  wireless telecommunications facilities, at the height necessary to provide coverage."  *Id*.  Finally,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    to be "buildable," a site "must have access to utilities, it must be capable of supporting the

2    antennas, and there must be enough space to place the antennas and other equipment." *Id.*

3         In support of its appeal of the ZAB's denial, Verizon submitted the Alternatives Analysis

4    in which it evaluated ten alternative sites for the proposed facility: a microcell network, three

5    façade- and roof-mounted facilities, and six freestanding tower facilities. A.R. 1694-1717. As to

6    the microcell network, Verizon determined that 12 microcell facilities would be required to serve

7    the gap. It concluded that the microcells "would be more readily visible than the Proposed

8    Facility"; would "be located adjacent to residential properties," whereas the proposed facility is

9    over 270 feet from the nearest residence; and "would lead to a more intrusive deployment overall."

10   A.R. 1699. As to the remaining nine alternatives, Verizon found that they were not feasible due to

11   their inability to serve the gap, "lack of landlord interest," environmental impacts and disruption of

12   public use, and ready visibility and visual impact. A.R. 1701-15. It concluded that the proposed

13   facility was "the least intrusive alternative under the values expressed in the Berkeley Municipal

14   Code." A.R. 1716.

15        The TLF report addressed the three façade- and roof-mounted facilities and six alternative

16   freestanding tower facilities set forth in the Alternatives Analysis and concluded that "none of the

17   alternative sites identified by Verizon offer any realistic possibility to be a viable alternative to the

18   proposed Berryman Reservoir site," although it did not address the microcell network alternative.

19   A.R. 1722-42.

20        Berkeley does not address whether Verizon made a prima facie showing at the first step of

21   the feasibility test. For its part, BRN argues that the court should not consider any of Verizon's

22   evidence on the effective prohibition claim because it "inserted" this evidence "into the

23   administrative hearing record without giving BRN advance notice of this evidence or a fair

24   opportunity to rebut it" with Berkeley's "knowledge and assistance." BRN's Mot. 23; *see. id* at 28

25   (claiming Verizon "improperly snuck [the material] into the record without any opportunity for

26   adversary testing"). BRN contends that Verizon submitted "new technical information, survey

27   data, and expert reports in support of its appeal" to Berkeley on July 1, 2020, less than one week

28   before the City Council hearing, and claims that "it would be a violation of federal and California

                                                    42

1   procedural due process rights for any factfinder" to consider any of this this evidence.  *Id.* at 6, 23.

2       To the extent that BRN claims the court may not consider the Alternatives Analysis in

3   particular, its argument is without merit.  Verizon submitted the Alternatives Analysis (which is

4   dated March 5, 2020) to Berkeley on March 16, 2020, nearly four months before the City

5   Council's hearing.  *See* A.R. 2976-77 (email transmitting documents).  In fact, Verizon and

6   Berkeley agreed to extend the shot clock to provide sufficient time for Berkeley to complete its

7   review of the analysis, including to obtain peer review of the same.  *See* A.R. 2929, 2934.[16]  BRN

8   does not explain whether or how it was prevented from reviewing the Alternatives Analysis prior

9   to the City Council hearing.  Its description of the Alternatives Analysis as "stealth and last

10  minute" is plainly inaccurate.[17]

11      At summary judgment, the court may conclude that a provider has made a prima facie

12  showing that the proposed facility is the "least intrusive means" of filling a purported gap in

13  coverage where it submits evidence that it considered alternatives and provides "adequate

14

---

15  [16] BRN's assertion that the Alternatives Analysis was not submitted until July 1, 2020 appears to
    be based on Verizon's re-submission of the document along with other evidence, including the
16  new alternative water tank design and Statement of Minimum Functional Height.  See A.R. 1558-
17  81.

18  [17] BRN appears to contend that Berkeley's failure to serve the Alternatives Analysis and other
    evidence Verizon submitted in support of the Application on BRN's counsel constitutes a
19  violation of its procedural due process rights.  *See* BRN's Mot. 4-5, 23.  It cites a December 16,
    2019 letter from BRN's counsel to Berkeley asking that it "provide on its website: (1) a 60 day
20  advanced notice of any public hearing on this appeal; and (2) advance access to any new evidence
    that the appellant intends to produce at the public hearing of this appeal."  *See id*. (citing A.R.
21  3114-23, 3126-32).  BRN's argument on this point is thin and the cases it cites are distinguishable.
    For example, in *Horn v. County of Ventura*, 24 Cal. 3d 605, 616 (1979), the California Supreme
22  Court held that "constitutional notice and hearing requirements" with respect to land use decisions
    "are triggered only by governmental action which results in 'significant' or 'substantial'
23  deprivations of property, not by agency decisions having only a de minimis effect on land."  In
    *American Tower*, the Ninth Circuit held that automatic approval of renewal permits for three
24  existing cell tower facilities "would constitute a substantial or significant deprivation of other
    landowners' property interests and that due process protections therefore apply," including
25  "reasonable notice and an opportunity to be heard."  763 F.3d at 1050-51 (citing *Horn*, 24 Cal. 3d
    at 616).  The existing facilities included "[d]ozens of antennas perched on hundreds of feet of
26  towers alongside hundreds of square feet of equipment shelters."  *Id*. at 1050.  Here, BRN does not
    explain how approval of the proposed facility (which has not happened) would result in
27  "significant" or "substantial" deprivations of BRN's property, or even how Berkeley failed to
    provide adequate notice and hearing procedures.  Moreover, BRN's constitutional arguments are
28  essentially claims that BRN might have in the future against Berkeley, not Verizon, and are not
    part of this lawsuit.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    explanations" as to why they are not "feasible alternative[s] to meet [the provider's] coverage

2    needs." *Los Angeles SMSA Ltd. P'ship v. City of Los Angeles, California, et al.*, No. LA CV16-

3    04954-JAK (SKx), 2020 WL 13662046, at *22 (C.D. Cal. Sept. 1, 2020); *see also Anacortes*, 572

4    F.3d at 996-99 (discussing provider's showing of a lack of available and feasible alternative sites).

5    Having considered Verizon's Alternatives Analysis and TLF's endorsement of nearly all of the

6    findings in that analysis, the court concludes that Verizon satisfied its burden to make a prima

7    facie showing that the proposed facility is the least intrusive means to remedy the claimed

8    significant gap.

9                          **b.        Berkeley's Rebuttal**

10          Verizon having made a prima facie showing that the proposed facility is the least intrusive

11   means for filling the purported significant gap, the burden shifts to Berkeley to rebut that showing.

12   *Anacortes*, 572 F.3d at 998.  Specifically, a "locality is not compelled to accept the provider's

13   representations," but "when a locality rejects a prima facie showing, it must show that there are

14   some potentially available and technologically feasible alternatives." *Id.*

15          The Denial Resolution stated "there are reasonable, potentially available and

16   technologically feasible alternatives to the proposed project.  Only the proposed height was

17   evaluated at the proposed site with standard approaches to the design that are usually more suited

18   to freeway locations, not a residential and open space area." A.R. 2710.  It did not identify any

19   concrete alternatives.  A.R. 2710.  In its opposition, Berkeley discusses the bases for its position

20   that the proposed facility is not "the least intrusive design for the site," including challenging the

21   faux tree design and its height.  Berkeley's Opp'n 27-28.  Berkeley also disputes Verizon's

22   conclusion in the Alternatives Analysis that a microcell network is "a less feasible and potentially

23   more intrusive alternative" that the proposed facility for various reasons. *Id.* at 28-29.  However,

24   the availability and feasibility of a microcell network were not part of the findings supporting the

25   denial that the City Council read into the record during the City Council meeting, nor were they

26   part of the Denial Resolution.  A.R. 2665-66, 2709-10.  The court declines to consider this post

27   hoc rationale regarding an alternative to the proposed facility. *See Am. Tower*, 763 F.3d at 1056

28   ("[i]n determining whether [the provider] met its burden of demonstrating that its facilities were

                                          44

1    the 'least intrusive means,' we examine the City's *stated ground* for concluding otherwise."

2    (emphasis added)); *see also GTE Mobilnet of Cal. v. City of Watsonville*, No. 16-cv-03987 NC,

3    2017 WL 492876, at *3 (finding "sites not fully considered by [plaintiff]" and arguments about

4    the applicability of CEQA that were not provided until after litigation commenced and never cited

5    by municipality in denying the application constituted "untimely post hoc rationalizations").

6          The court concludes that Berkeley failed to show the existence of an available,

7    technologically feasible alternative that remedies that gap alleged by Verizon.  Accordingly, it did

8    not meet its burden to rebut Verizon's argument that there were no "technologically feasible

9    alternatives" to the proposed facility.  *See Anacortes*, 572 F.3d at 998-99.  Verizon is thus granted

10   summary judgment on the second prong of the effective prohibition test, "some inquiry into the

11   feasibility of alternative facilities or site locations."  *Id*. at 995.

12         **D.      Remedies**

13         The parties dispute the appropriate remedy if Verizon prevails on its failure-to-act claim.

14   Verizon contends that it is entitled to an order directing Berkeley to issue all necessary permits and

15   approvals to construct the proposed facility.  Pl.'s Mot. 24.  Berkeley and BRN contend that such

16   relief is inappropriate since Verizon has now received a written denial.  Berkeley's Opp'n 18;

17   BRN's Mot. 15-17.  The court finds that it is appropriate to defer the question of the appropriate

18   remedy for the failure-to-act claim until the effective prohibition claim is resolved, because

19   resolution of the effective prohibition claim in Verizon's favor would effectively moot the relief

20   requested on the failure-to-act claim.

21   **VI.    CONCLUSION**

22         For the foregoing reasons, Verizon and BRN's motions for summary judgment are granted

23   in part and denied in part, as follows: summary judgment is granted in Verizon's favor on the

24   failure-to-act claim and on the second prong of the effective prohibition claim.  Summary

25   judgment is granted in BRN's favor on the substantial evidence claim.  Summary judgment is

26   denied on the first prong of the effective prohibition claim.  The following issues remain: 1) the

27   first prong of the effective prohibition claim, i.e., the showing of a "significant gap" in service

28   coverage; and 2) the appropriate remedy for the failure-to-act claim.

45

1      The court will conduct a further CMC on May 17, 2023 at 1:30 p.m.  A joint CMC

2 statement that includes a proposed schedule is due by May 10, 2023.

3

4      **IT IS SO ORDERED.**

5 Dated: March 27, 2023



6

7                        Donna M. Ryu

8                        Chief Magistrate Judge

9

10

11

12

United States District Court
Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28